IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| REALPAGE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:06-CV-251 |
| | § | |
| EPS, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The following are pending before the court:

1. Plaintiff's motion for partial summary judgment and brief in support (docket entry # 10);

2. Defendant's response to Plaintiff's motion for partial summary judgment (docket entry # 11);

3. Plaintiff's reply in support of Plaintiff's motion for partial summary judgment (docket entry # 12);

4. Defendant's sur-reply to Plaintiff's motion for partial summary judgment (docket entry # 14);

5. Defendant's motion for summary judgment and brief in support (docket entry # 26);

6. Plaintiff's response to Defendant's motion for summary judgment (docket entry # 31);

7. Defendant's reply in support of motion for summary judgment (docket entry # 36); and

8. Plaintiff's sur-reply to defendant's motion for summary judgment (docket entry # 38).

Having considered the plaintiff's motion for partial summary judgment and the respective responsive briefing thereto and the defendant's motion for summary judgment and the respective briefing thereto, the court is of the opinion that Plaintiff's motion should be DENIED, and Defendant's motion should be GRANTED.

## I.  BACKGROUND

This diversity action arises out of commercial relations between RealPage, Inc. ("Plaintiff") and EPS, Inc. ("Defendant").  Plaintiff creates and markets accounting and reporting software in support of the multifamily housing industry.  (Pl.'s Mot. for Partial Summ. J. 2.)  Defendant operates as a service bureau for the subsidized housing industry.  (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 2.)  A service bureau assists housing project owners and managers in discharging their reporting requirements to the United States Department of Housing and Urban Development ("HUD").  (*Id*.)  These tasks are simplified by services and software like those provided by Plaintiff.  Plaintiff regularly updates its software by sending diskettes or CD-ROMs to its customers.  (Pl.'s Mot. for Partial Summ. J. 3.)  In order to install the updates, the user must first indicate acceptance of a "clickwrap" license agreement.[1]  (*Id*.)  If the user does not indicate acceptance, the program will not allow the update to install.  *Id*. at 4.)

On September 5, 1997, Defendant entered into a Service Bureau License Agreement ("1997 Agreement") with Rent Roll, Inc. (predecessor in interest to Plaintiff) whereby Defendant

---

[1] A clickwrap agreement derives its name from the similarities contained by such agreements to shrinkwrap licenses found in many tangible packages.  Clickwrap agreements allow users to manifest assent to contractual terms presented to the user before installation of computer software programs.  Generally, as here, the user must indicate acceptance of the clickwrap agreement to proceed with the installation.  *Specht v. Commc'ns. Corp.*, 306 F.3d 17, 22 n.4 (2nd Cir. 2002).

obtained a license to use Rent Roll's service bureau software, HUDManager, until the stated expiration date of June 30, 2002. (Pl.'s Mot. for Partial Summ. J. Pl. App. 011-012C, Ex. B.) The 1997 Agreement granted Defendant a license to use the software "solely for the purpose of processing data and performing Services on behalf of Customers." (*Id*. at Pl. App. 011, Ex. B.) The 1997 Agreement provided for renewal "by the mutual written agreement of the parties." (*Id*. at Pl. App. 012, Ex. B.) In April 2002, the parties signed a document extending the term of the 1997 Agreement to June 30, 2003. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Def. App. 0056, Ex. I.) In May 2002, Defendant was billed and paid for the license term through June 30, 2003. (*Id*. at Def. App. 0058, Ex. J.) In response, Plaintiff provided Defendant with a password enabling Defendant to continue use of the software. (*Id*. at 4.) In May 2004, Plaintiff sent Defendant an invoice for renewal of the license for June 2004 through June 2005. (*Id*.) Defendant paid the invoice and was given a password to enable continued use of the software for that term. (*Id*.) The same was done in May 2005 and May 2006. (*Id*. at 4-5.) On May 25, 2006, Plaintiff's employee Ranjeev Teelock sent a fax to Defendant indicating that Plaintiff believed that the 1997 Agreement had expired and that Defendant's contemporaneous use of the software exceeded the license it was then operating under. (*Id*. at Def. App. 0078, Ex. S.) On June 7, 2006, Plaintiff sent a letter to Defendant indicating that the prior invoice was mistakenly sent to Defendant, that Defendant's use of the software exceeded the scope of the license under which it was operating, and that a refund for the payment tendered in May 2006 would be forthcoming. (*Id*. at Def. App. 0082, Ex. U.)

      Throughout the course of the parties' relationship, Plaintiff sporadically distributed, and Defendant installed, updates to the software as needed. (Pl.'s Mot. for Partial Summ. J. 3-4.)

The clickwrap license agreements ("CLAs") accompanying each update purported to amend the license under which Defendant used the software.  The preamble to each CLA contains language indicating the legal effect Plaintiff intended the CLAs to have.  Particularly relevant is the statement that "THIS IS A LEGALLY BINDING AGREEMENT BETWEEN REALPAGE, INC. AND CUSTOMER.  REALPAGE, INC. IS WILLING TO LICENSE USE OF THE LICENSED SOFTWARE AND DOCUMENTATION ONLY UPON CONDITION THAT CUSTOMER ACCEPTS ALL OF THE TERMS CONTAINED IN THIS SOFTWARE LICENSE AGREEMENT ("THE AGREEMENT")." (*Id*. at Pl. App. 033, Ex. G.)  Beginning in May 1997 with the version 1.2.0 update and culminating in December 2005 with the version 1.8.2 update, Plaintiff distributed and Defendant installed a total of eight updates to the HUDManager software.  (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 7-8.)  Several updates were installed during the primary term of the 1997 Agreement, while the remainder were installed after the primary term of same.  (*Id*.)  The CLAs purported to alter the parties' relationship in several ways, two of which are material here.

First, each CLA, including those installed during the primary term of the 1997 Agreement, stated that the "[c]ustomer may not: ...use the Software on any service bureau." (*See, e.g.*, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Def. App. 0040, Ex. E.)  Second, the CLAs described three types of licenses, and descriptions thereof, under which customers would be allowed to operate the software.   (*See, e.g.*, *Id*.)  The licenses are enumerated as follows:

> If Customer has purchased single CPU license (as indicated on the order Form), Customer may use the Software only in machine-readable form on a single microcomputer at any one time. If Customer has purchased a site License (as indicated on the Order Form), Customer may use the Software in machine-readable form at a designated property for the benefit of that property only on a

> single local area network (single file server). If Customer has purchased a wide area network or remote access license (as indicated on the Order Form), Customer may use the Software on a single server for the benefit of multiple properties managed by it, provided Customer pays a per site charge for each property having access to the Software.

(*See, e.g.*, *Id*.)  Therefore, according to the CLAs, there were three bases under which Defendant could use the software.  Arguing that Defendant exceeded the scope of the software licenses, Plaintiff urges causes of action for breach of contract and *quantum meruit* in its First Amended Complaint.

## II.  LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981)(citations omitted). The substantive law identifies which facts are material.  *See id*. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See id*. at 247.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary

judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant must adduce affirmative evidence. *See Anderson*, 477 U.S. at 257.

### III.  DISCUSSION AND ANALYSIS

**A.  Plaintiff's Breach of Contract Claim**

The parties agree that the 1997 Agreement governed their relationship until June 2002, and then by agreed written extension until June 30, 2003. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 3; Pl.'s Mot. for Partial Summ. J. 3.) Plaintiff contends that the 1997 Agreement terminated on June 30, 2003. (Pl.'s Mot. for Partial Summ. J. 6.) Plaintiff further contends that the relationship between it and Defendant was thereafter governed by the terms enumerated in the CLAs, particularly that the use of the software in a service bureau operation exceeded the scope of Defendant's license. (Pl.'s Mot. for Partial Summ. J. 6.) Plaintiff thus argues that Defendant's use of the software in a service bureau operation violated the terms of the parties' agreement, as defined in the CLAs, after the 1997 Agreement expired. Finally, Plaintiff argues that Defendant used the software consistent with the Remote Access License, obligating Defendant to pay Plaintiff a fee for each site on which Defendant used the software. (Pl.'s Mot. for Partial Summ. J. 5.) Plaintiff argues that the per-site fees were "$15.00 per housing unit, with

a minimum charge of $450.00 and a maximum charge of $1,500.00 per HUD property." (Pl.'s Mot. for Partial Summ. J. 9.) Defendant admitted to using the software for at least 289 properties. (Pl.'s Mot. for Partial Summ. J. Pl.'s App. 044, Ex. J.)

In order to succeed on a breach of contract theory, Plaintiff must establish "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston[1st Dist.] 2003, pet. denied). Defendant contends that the parties' pattern of invoice and payment created a contractual posture between the parties, governing their relationship upon the completion of the primary term of the 1997 Agreement. (Def.'s Sur-Reply 1-2.) Under this analysis, Defendant would have the court find that the parties continuously operated under the 1997 Agreement. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 9.) Defendant also argues that the CLAs were too indefinite to constitute valid agreements (Def.'s Sur-Reply 1-2.) In this vein, Defendant argues that it was never quoted the price terms Plaintiff argues apply to the parties' relationship. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5.) Defendant also contends that it never elected to operate under a Remote Access License. Rather, the parties continually renewed the 1997 Agreement through their pattern of invoice and payment. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5.)

The primary issue is the determination of the nature of the parties' relationship. That is, upon expiration of the primary term of the 1997 Agreement, did the parties, either through written agreement or behavior, continue a contractual relationship? If they did maintain a contractual relationship, what were the terms of that relationship? To decide this issue, the court

a minimum charge of $450.00 and a maximum charge of $1,500.00 per HUD property." (Pl.'s Mot. for Partial Summ. J. 9.) Defendant admitted to using the software for at least 289 properties. (Pl.'s Mot. for Partial Summ. J. Pl.'s App. 044, Ex. J.)

In order to succeed on a breach of contract theory, Plaintiff must establish "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston[1st Dist.] 2003, pet. denied). Defendant contends that the parties' pattern of invoice and payment created a contractual posture between the parties, governing their relationship upon the completion of the primary term of the 1997 Agreement. (Def.'s Sur-Reply 1-2.) Under this analysis, Defendant would have the court find that the parties continuously operated under the 1997 Agreement. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 9.) Defendant also argues that the CLAs were too indefinite to constitute valid agreements (Def.'s Sur-Reply 1-2.) In this vein, Defendant argues that it was never quoted the price terms Plaintiff argues apply to the parties' relationship. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5.) Defendant also contends that it never elected to operate under a Remote Access License. Rather, the parties continually renewed the 1997 Agreement through their pattern of invoice and payment. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 5.)

The primary issue is the determination of the nature of the parties' relationship. That is, upon expiration of the primary term of the 1997 Agreement, did the parties, either through written agreement or behavior, continue a contractual relationship? If they did maintain a contractual relationship, what were the terms of that relationship? To decide this issue, the court

must confront the effect of the invoices sent by Plaintiff and the effect of the CLAs accompanying each update.

**1. The Effect of the Invoices**

In May of each year from 2002 through 2006, Plaintiff mailed and Defendant paid invoices for renewal of the software license. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., Ex. J-N.) Plaintiff cites Section 2.209(b) of the Texas Business and Commerce Code for the proposition that the invoices did not constitute written modification of the 1997 Agreement as required in that agreement. TEX. BUS. & COMM. CODE ANN. § 2.209(b) (Vernon 2006); (Pl.'s Mot. for Partial Summ. J., Pl.'s App. 012, Ex. B.) That Section states:

> A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

Thus, for a form (here, the invoices) to create (or extend) a contractual relationship between the parties, it must be provided by one party and signed by the other. In addition, Section 2.201 requires that, to be enforceable, contracts "for the sale of goods for the price of $500 or more" must be "signed by the party against whom enforcement is sought." TEX. BUS. & COMM. CODE ANN. § 2.201 (Vernon 2006). Because the price of the goods sold exceeded $500, and because of the command of Section 2.209(b), the invoices therefore must have been signed by both parties to create enforceable contractual rights on behalf of Defendant based on the invoices.

Each invoice was sent on Plaintiff's letterhead and signed by one of Defendant's agents. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., Ex. J-N.) Texas courts have held that an invoice can be sufficient to create a contract between parties. *Cox Eng'g. V. Funston Mach. and Supply*

*Co.*, 749 S.W.2d 508 (Tex. App.—Waco Mar. 10, 1988, no writ.), *overruled on other grounds by Ruiz v. Conoco, Inc.*, 36 Tex. Sup. J. 412 (1992); *See also Artemis Seafood v. Butcher's Choice, Inc.*, 1999 U.S. Dist. LEXIS 12538, *5 n.5 (N.D. Tex. 1999).

In *Cox Engineering,* the court was faced with whether invoices sent by Cox Engineering constituted written confirmation of prior oral agreements. *Cox Eng'g.*, 749 S.W.2d at 510. The court determined that Cox's letterhead on the invoices "provid[ed] an authentication that identifies the party to be charged." *Id*. at 511. The court went on to note that this construction of the statute of frauds furthers the purposes of the Uniform Commercial Code. *Id.* at 511. In the instant case, Plaintiff's invoices were sent on its letterhead. This indication of Plaintiff's identity is sufficient to satisfy the requirements of Section 2.201. In addition, Defendant's signature on the invoices satisfies the requirements of Section 2.209(b) regarding modification of a signed agreement. In order for an invoice to satisfy the statute of frauds, it must also evidence a contract for the sale of goods and specify a quantity. *Cox Eng'g.* at 510. The invoices provided in the exhibits by both parties unquestionably satisfy these requirements. As such, the invoices were sufficient to constitute a writing to amend the 1997 Agreement within the meaning of the Texas Business and Commerce Code.

Plaintiff directs the court to *Daniel Bros. v. W. Tex. Equip. Co.*, 576 S.W.2d 701 (Tex. Civ. App.—Amarillo 1979, no writ) for the proposition that a signed invoice does not establish that the recipient had contracted to perform an obligation in a specific county. (Pl.'s Mot. for Partial Summ. J. 9.) That case, however, dealt with establishing the place of performance of a contract for venue purposes rather than whether a contract had in fact been created. *Daniel Bros.*, 576 S.W.2d at 703 ("Where the oral agreement makes no provision for place of payment,

subsequent delivery tickets or invoices will not enlarge or alter the completed contract to include venue provisions..."). Therefore, *Daniel Bros.* is inapposite. The written invoices sent annually by Plaintiff to Defendant therefore continued the preexisting contractual relationship between the parties established under the 1997 Agreement.

### 2. Effect of the CLAs

Plaintiff vigorously argues that the parties' relationship after the first extension of the 1997 Agreement was governed by the terms contained in the CLAs. (Pl.'s Mot. for Partial Summ. J. 5-6.) Defendant argues with equal vigor that the CLAs did not affect the relationship between the parties because the CLAs were not intended as new offers, were too indefinite to constitute offers, did not represent a meeting of the minds, were not accompanied by consideration, and could not materially alter the terms of the 1997 Agreement. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 11-17.)

The CLAs were presented to Defendant each time it attempted to install an update to the software. (Pl.'s Mot. for Partial Summ. J. 3.) To install an update, a user would need to click on a box that states "I accept the terms of the license agreement." (Pl.'s Mot. for Partial Summ. J. 4.) The CLAs did not require Defendant to scroll through the entirety of the agreement prior to indicating acceptance. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 6.) Defendant points to this fact as an additional deficiency in the CLAs. (Def.'s Sur-Reply 8.) Texas law recognizes the validity of clickwrap agreements. In *Barnett v. Network Solutions, Inc.*, a Texas Appellate court upheld a forum selection clause contained in a CLA. *Barnett v. Network Solutions, Inc.*, 38 S.W.3d 200, 203 (Tex. Civ. App.—Eastland 2001, pet. denied). Central to the court's holding was the fact that Barnett was conspicuously presented with the agreement prior to entering into a

-10-

contract with Network Solutions. *Id.* at 204. Similarly, the court in *Recursion Software* held a CLA to be binding because "the user's very ability to download the program was predicated upon its acceptance of the license terms." *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 782 n.14 (N.D. Tex. 2006). In the instant case, in order to install each update, the Defendant was required to indicate acceptance of the CLA. Failure to do so would abort the update process. Defendant argues under *Barnett* that a CLA must require the user to scroll through the agreement before being allowed to indicate acceptance. While such a requirement is certainly evidence of notice of the terms in a CLA, *Barnett* is not clear on this point. In fact, some language indicates that *Barnett* holds the customer to the terms of a CLA regardless of whether it requires the user to scroll through the agreement before allowing the user to indicate acceptance. "It was Barnett's responsibility to read the electronically-presented contract, and he cannot complain if he did not do so." *Barnett*, 38 S.W.3d at 204. As such, the court finds that the clickwrap license agreements presented by Plaintiff are enforceable, provided that they do not fail under principles of contract contained in the Texas Business and Commerce Code.

Defendant argues that the CLAs fail for indefiniteness. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 13.) Defendant claims that the CLAs neither specified the type of license under which it was allowed to use the software nor a price term. (*Id.*) Section 2.305 of the Texas Business and Commerce Code allows parties to enter into binding contracts in the absence of a price term. TEX. BUS. & COMM. CODE § 2.305(a) (Vernon 2006). Thus, the absence of a price term is not fatal to contract formation. Moreover, Section 2.204(c) states that a contract for the sale of goods does not fail for indefiniteness "[e]ven though one or more terms are left open," so

long as "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." TEX. BUS. & COMM. CODE § 2.204(c) (Vernon 2006). The comment to Section 2.204 provides, in part "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions." TEX. BUS. & COMM. CODE § 2.204, cmt. (Vernon 2006).

In the instant case, the CLAs established three types of licenses under which Defendant could use the software. (*See, e.g.*, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Def.'s App. 0052, Ex. H.) The CLAs, however, provided no mechanism by which Defendant could elect which license to purchase. The CLAs do make reference to an order form on which the customer would be able to make such an election, but any such order form is absent from the record and the parties make no reference thereto. Therefore, under the CLAs, the parties could have been bound under any of three license agreements, and there is no indication that any of the three was selected by either party at the time any of the updates were installed. It goes without saying that the type of license agreement is central to the issue of the indefiniteness of the CLAs. The CLAs also lack price terms. Plaintiff urges that the annual price of Defendant's license after June 30, 2003 was "$15.00 per housing unit, with a minimum charge of $450.00 and a maximum charge of $1,500.00 per HUD property." (Pl.'s Mot. for Partial Summ. J. 9.) However, there is no indication whatsoever that this price term was ever offered to Defendant. In fact, the record suggests that Defendant's first exposure to this price term was in the Plaintiff's original complaint. As such, the court finds that the CLAs also lacked price terms.

The CLAs thus lack two material terms. One of these terms is the basic framework under

which the CLAs were to bind the parties. The other term is price. As discussed above, Section 2.204(c) allows contract formation in the absence of multiple terms. TEX. BUS. & COMM. CODE § 2.204(c) (Vernon 2006). However, one requirement in such cases is that a court have "reasonably certain basis for giving an appropriate remedy." *Id.* In the absence of the missing terms, the CLAs do not give this court any such basis. For this court to bind the parties under the CLAs, the court or a jury would have to speculate as to which license Defendant chose, and the record does not indicate that Defendant ever elected to use the software pursuant to any particular license. Moreover, the parties continued to conduct themselves in a fashion consistent with the 1997 Agreement rather than any particular license described in the CLAs. It should be noted that the CLAs accompanying each update from 1997 though 2005 were identical in all material respects. That is, they each listed the same licensing options, and they each provided that Defendant was not to use the software in a service bureau operation. Plaintiff, therefore, would have this court determine that the CLAs Defendant encountered before June 30, 2003 were properly ignored by the parties while identical CLAs encountered by Defendant after that date should be given binding effect.

Such treatment is contrary to the summary judgment evidence. Plaintiff sent Defendant an invoice on May 2, 2002 for payment of $2,120 for the annual license fee from June 30, 2002 until June 30, 2003. (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Def.'s App. 0058, Ex. J.) The parties agree that the 1997 Agreement governed their relationship at this time. (Pl.'s Mot. for Partial Summ. J. 6.) The following May invoices from 2003-2006 were each in the amount of $2,200. (*See, e.g.*, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. Def.'s App. 0064, Ex. M.) That the price in the invoices for license renewal after Plaintiff contends the 1997 Agreement

expired so closely approximates the price in the invoice for license renewal during the time Plaintiff concedes that the 1997 Agreement was applicable reflects an understanding that the parties' relationship continuously existed under the same terms. Further damage is done to Plaintiff's argument that the CLAs defined the parties' contractual posture by the fact that it was able to monitor Defendant's use of the software beginning in 2004. (Pl.'s Mot. for Partial Summ. J. 8.) Plaintiff therefore sent Defendant at least two invoices consistent with the 1997 Agreement after it had knowledge of the uses Defendant made of the software. Even though Plaintiff now contends that Defendant's use of the software exceeded the scope of the license as enumerated in the CLAs, it acted, with full knowledge of Defendant's use of the software, for at least two annual billing cycles as though Defendant made proper use of the software. Thus, both parties continued to treat identical CLAs in an identical manner both before and after their dispute as to the validity of the 1997 Agreement. That is, they ignored them. This court has no basis for ignoring one set of CLAs and binding the parties under another set of CLAs when both parties treated every CLA in precisely the same fashion. Because neither the documents created by the parties nor their actions illuminate the court as to which CLA licensing option either party chose to operate under (and, indeed, whether *any* CLA license option was chosen), the court finds that it lacks a "reasonably certain basis for giving an appropriate remedy." TEX. BUS. & COMM. CODE § 2.204(c) (Vernon 2006). Therefore, as a matter of law, the CLAs fail for indefiniteness and can neither modify the 1997 Agreement nor create contractual relations between the parties.

  Plaintiff urges the court to follow *ProCD v. Zeidenberg*, a Seventh Circuit case holding the parties therein to a similar clickwrap agreement. *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996). In that case, the court upheld a clickwrap agreement that was presented to the

customer after purchase in a "money now, terms later" agreement. *Id*. at 1452. However, *ProCD* did not involve an issue of indefiniteness. There, Zeidenberg was presented with a definite agreement enforceable against both parties upon acceptance. *See Id*. at 1452-53. Here, however, the court has found that the CLAs fail for indefiniteness. Thus, "acceptance" of the CLAs did not represent assent to any legally enforceable agreement. *See* TEX. BUS. & COMM. CODE ANN. § 2.204(c) (Vernon 2006). *ProCD*, therefore, is inapplicable to the case at bar.

The parties, through a pattern of invoice and payment, created a series of extensions to the 1997 Agreement. That agreement provided that modifications must be in writing, and the invoices satisfied the writing requirement. Because the court finds that the CLAs fail for indefiniteness as a matter of law, nothing in the record reveals a mechanism by which the parties amended their extensions of the 1997 Agreement. Therefore, the parties continuously operated under the terms of the 1997 Agreement, making Defendant's use of the software in a service bureau operation within the scope of the parties' agreement. Thus, there is no genuine issue of material fact regarding Plaintiff's claim that Defendant breached the contract, *Dorsett*, 106 S.W.3d at 217, making summary judgment for Plaintiff improper. *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Moreover, on this claim, there is no competent summary judgment evidence introduced by Plaintiff of "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Plaintiff has introduced no evidence to raise a genuine issue of material fact, FED. R. CIV. P. 56(c), as to whether Defendant breached the 1997 Agreement, a necessary element of Plaintiff's claim. *Dorsett*, 106 S.W.3d at 217. Therefore, summary judgment disposition of Plaintiff's breach of contract claim is proper.

## B. Plaintiff's *Quantum Meruit* Claim

Plaintiff also presses a claim for recovery against Defendant in *quantum meruit*. (Pl.'s First Am. Compl. 6.) In order to succeed on a theory of *quantum meruit*, a party must establish that

> 1) valuable services were rendered or materials furnished, 2) for the person sought to be charged, 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, and 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Vortt Exploration Co. v. Chevron USA, Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). In addition, equitable relief such as *quantum meruit* is generally available only in the absence of an express contract governing the commercial relations between the parties. *Id.*; *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). The court has already found that the parties were bound by a valid written agreement at all times material. *See* Part III.A.2., *supra*. Therefore, Plaintiff's *quantum meruit* claim must fail. On this claim, Plaintiff has adduced no "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Therefore, summary judgment disposition of Plaintiff's *quantum meruit* claim is proper. The court hereby acknowledges but need not address Defendant's argument that Plaintiff's "claims sounding in quasi-contract" are preempted by federal copyright laws. (Def.'s Mot. for Summ. J. 19.)

## **CONCLUSION**

Based on the foregoing, the court hereby **DENIES** Plaintiff's motion for partial summary judgment (docket entry #10) and **GRANTS** Defendant's motion for summary judgment (docket entry # 26).

IT IS SO ORDERED.

**SIGNED this the 4th day of September, 2007.**

_____
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE